# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Richmond Division

UNITED STATES OF AMERICA

v.  Criminal Action No. 3:08cr133

BAILEY DANIELS,

   Petitioner.

## REPORT AND RECOMMENDATION

This matter comes before the Court for an evidentiary hearing and a Report and Recommendation as to the § 2255 Petition ("Petition") filed by Bailey Daniels, a federal prisoner. On January 13, 2011, the Court held an evidentiary hearing. The parties have submitted proposed findings of fact and conclusions of law (Docket Nos. 89, 90), and the matter is ripe for disposition. For the following reasons, the Court RECOMMENDS that Daniels's claim of ineffective assistance of counsel based on his attorney's failure to file a timely appeal or adequately consult with Petitioner about filing an appeal be DISMISSED, and the Petition be DENIED.

### I. Factual and Procedural Background

On March 17, 2008, a federal grand jury indicted Daniels on four counts. Count One charged Daniels with conspiracy to distribute cocaine hydrochloride and fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846. Counts Two and Three alleged that Daniels used a communication facility in commission of a felony, in violation of 21 U.S.C. § 843(b). Finally, Count Four charged Daniels with possession of a firearm in furtherance of a drug trafficking

crime, in violation of 18 U.S.C. § 924(c). (Docket No. 18.) Daniels retained Brent Jackson to represent him throughout his criminal proceedings.

On April 29, 2008, Daniels pled guilty to Count One of the Indictment with a written plea agreement and statement of facts. (Docket Nos. 28, 29; Apr. 29, 2008 Plea Hr'g Tr. ("Plea Hr'g Tr."), at 7:4-10, 17:2-11.) Daniels admitted that, from July 2006 through February 2008, he knowingly, intentionally, and unlawfully participated in a conspiracy with others to distribute fifty grams or more of cocaine base. (Statement of Facts ¶ 1.) Daniels further agreed that, for sentencing purposes, he was responsible for distributing at least 150 grams but less than 500 grams of cocaine base. (Statement of Facts ¶ 4.)

On August 1, 2008, the Honorable Henry E. Hudson sentenced Daniels to 135 months of imprisonment. (Aug. 1, 2008 Sentencing Hr'g Tr. ("Sentencing Hr'g Tr."), at 12:18-20.)

On July 13, 2009, Daniels filed his Petition pursuant to 28 U.S.C. § 2255. (Docket No. 61.) Daniels alleged various grounds of ineffective assistance of counsel. By Memorandum Opinion and Order entered August 30, 2010, the Court denied Daniels's Petition as to all grounds, except as to his claim that his counsel failed to file a timely appeal or adequately consult with him about filing an appeal. (Docket Nos. 74, 75.) The Court referred the remaining claim to the undersigned Magistrate Judge for an evidentiary hearing. (Docket No. 75.)

This Court ordered that counsel be appointed to Daniels and an evidentiary hearing scheduled as to the remaining issue raised in Daniels's Petition: whether trial counsel failed to file an appeal or adequately consult with Daniels about filing an appeal. (Docket No. 78.) On January 13, 2011, the Court held an evidentiary hearing.

## II. Standard of Review and Burden of Proof

A petitioner collaterally attacking his or her conviction bears the burden of proving that the conviction imposed violated the United States Constitution or laws, that the court lacked jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. The petitioner has the burden of proving the grounds for the collateral attack by a preponderance of the evidence. *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967); *White v. United States*, 352 F. Supp. 2d 684, 686 (E.D. Va. 2004). In a § 2255 proceeding, a court may hold an evidentiary hearing to "determine the issues and make findings of fact and conclusions of law." 28 U.S.C. § 2255(b). When making findings of fact, the court should determine the credibility of witnesses and reliability of other evidence. *See United States v. Roane*, 378 F.3d 382, 393-94, 409 n.15 (4th Cir. 2004).

## III. Findings of Fact

Supplementing the procedural events above, the Court makes the following findings of fact based on the record in this case and testimony given at the evidentiary hearing.

### A. Daniels's Guilty Plea

1. On April 16, 2008, about a month after a grand jury indicted Daniels, the Assistant United States Attorney communicated a plea offer to trial counsel Jackson. (Pet'r's Mem. Supp. § 2255 Pet. Attach. 4, Letter to Brent A. Jackson from Peter S. Duffey (Apr. 16, 2008).) Pursuant to this plea offer, Daniels would agree to plead guilty to Count One of the Indictment, and the United States would dismiss the remaining three counts. In the same communication, the Assistant United States Attorney indicated his intent to file an enhancement

notice, pursuant to 18 U.S.C. § 851, based on a prior drug conviction if Daniels proceeded to trial. If the United States filed an enhancement notice, the mandatory minimum Daniels faced would be doubled to twenty years of imprisonment.

2. Prior to Daniels's plea, Jackson discussed this plea offer with Daniels. (Evid. Hr'g Tr. 39:1-5.) Jackson explained the mandatory minimum sentence and the maximum possible sentence Daniels faced under the plea agreement and explained that Daniels would waive his right to appeal the case as long as Daniels ultimately received a sentence below the statutory maximum. (Evid. Hr'g Tr. 38:22-39:5, 42:7-17.) Given the strength of the Government's evidence against him, Daniels decided to plead guilty. (Evid. Hr'g Tr. 39:9-20.) However, Daniels declined to enter into a cooperation agreement with the Government because such cooperation could incriminate family members, including Daniels's sister, Idina Daniels. (Evid. Hr'g Tr. 39:21-40:1, 41:18-20.)

3. On April 29, 2008, Judge Hudson conducted Daniels's plea colloquy. Daniels represented to the Court that he decided to enter a guilty plea to Count One because it was in his best interest to do so and because he was in fact guilty of conspiracy to distribute fifty grams or more of cocaine base. (Plea Hr'g Tr. 6:6-19.) Daniels agreed that he was "responsible for the distribution of at least 150 grams, and less than 500 grams" of cocaine base. (Plea Hr'g Tr. 8:15-18; Statement of Facts ¶ 4.) Daniels indicated that he wanted to enter a plea of guilty "to take responsibility" for his actions. (Plea Hr'g Tr. 9:2-4.)

4. Under oath, Daniels informed the Court that he had had a sufficient opportunity to discuss the case with Jackson and that he was satisfied with Jackson's representation:

> THE COURT: Have you had an opportunity to discuss this charge in detail with your attorney, Mr. Jackson?
> MR. DANIELS: Yes, sir.

4

> THE COURT: Are you entirely satisfied with his services?
> MR. DANIELS: Yes, sir.
> THE COURT: Has he done everything reasonable you have asked him to do in connection with this case?
> MR. DANIELS: Yes, sir.
> . . . .
> THE COURT: . . . . [H]ave you and Mr. Jackson explored whether you have any legal defenses to this charge, or there is any legitimate way, based upon the evidence, you can avoid being convicted; have you been through all this with Mr. Jackson?
> MR. DANIELS: Yes, sir.
> . . . .
> THE COURT: Do you feel like you need any[ ]more time to discuss your plea of guilty with Mr. Jackson?
> MR. DANIELS: No, sir.

(Plea Hr'g Tr. 4:4-12, 5:19-24, 18:11-13.) Daniels further represented to the Court that he had had a sufficient opportunity to discuss both the written plea agreement and statement of facts with Jackson. (Plea Hr'g Tr. 7:15-17, 17:17-18.)

5. Daniels represented to the Court that he understood the charge in Count One and the penalties that the charge carried:

> THE COURT: . . . . Mr. Daniels, what is the mandatory minimum sentence you could receive upon being convicted of this charge?
> MR. DANIELS: Ten years.
> THE COURT: It carries a sentence of 10 years and a maximum of life.
> MR. DANIELS: Yes, sir.

(Plea Hr'g Tr. 12:22-13:3.) He also affirmed that while he had discussed sentencing possibilities with Jackson, Daniels understood that no agreement as to sentencing existed and that the Court, guided by the Sentencing Guidelines and 18 U.S.C. § 3553(a), would determine Daniels's sentence. (Plea Hr'g Tr. 8:5-13, 13:7-15:13.) Daniels told the Court that he understood that any estimate regarding the ultimate sentence imposed could only be a prediction, and did not constitute a promise on which Daniels could rely to enter into a guilty plea. (Plea Hr'g Tr. 13:20-

5

14:10.) Daniels further confirmed that he understood that the Court could depart upward or downward from the Sentencing Guidelines if appropriate. (Plea Hr'g Tr. 14:17-15:8.)

6.  The Court notified Daniels, and Daniels indicated that he understood, that if the Court accepted his guilty plea, Daniels's ability to appeal would be severely limited:

> THE COURT: .... Once I accept your plea of guilty, there will be no trial. That plea of guilty is final and can't be appealed. Do you understand you can't appeal a guilty plea?
> MR. DANIELS: Yes, sir.
>
> ....
> THE COURT: In Paragraph Number 6 of your plea agreement, you have waived your right of appeal. I want to make sure you understand it .... [Y]ou have waived your right of appeal as to any guideline decisions that I make, do you understand that?
> MR. DANIELS: Yes, sir.
> THE COURT: In addition, ... you can't appeal the sentence you receive. And, Mr. Daniels, I have no idea [what] sentence you're going to receive .... But if after reading over the presentence report I believe you deserve a life sentence, and I doubt that's going to happen, but let's assume that I do, okay? No matter how unfair you think it is, you can't appeal that, do you understand? You've waived it.
> MR. DANIELS: Yes, sir.

(Plea Hr'g Tr. 11:14-18, 15:14-16:11; *see also* Plea Agreement ¶ 6.)

7.  The Court accepted Daniels's plea of guilty and made the finding that his plea of guilty was "voluntarily, knowing, and intelligently entered with the understanding of the nature of the charge, the consequences of the plea, and the penalty provisions" faced. (Plea Hr'g Tr. 18:22-25.) The Court further found that Daniels entered into the guilty plea after thoroughly consulting with Jackson. (Plea Hr'g Tr. 19:1-3.)

### B.  Daniels's Sentencing Hearing

8.  On August 1, 2008, Judge Hudson presided over Daniels's sentencing hearing. The Court informed Daniels and counsel of record that Daniels's Presentence Investigation

6

Report ("PSR") concluded that Daniels's offense level totaled 29, that he fell within criminal history category III, and that his guideline range, after considering the ten-year mandatory minimum sentence, therefore fell between 120 to 135 months of imprisonment. (Sentencing Hr'g Tr. 4:7-13.)

9. While Daniels had noted two objections to the PSR, those objections were resolved prior to sentencing. (Sentencing Hr'g Tr. 4:2-6, 6:10-12.) At the evidentiary hearing, however, Daniels contended that these objections were withdrawn without his knowledge. (Evid. Hr'g Tr. 22:24-23:3.)

10. Immediately prior to sentencing, Jackson spoke to Daniels for over forty minutes and with Daniels's family for another thirty minutes. (Sentencing Hr'g Tr. 3:2-5.) Jackson discussed the PSR and the computation of the guideline range with Daniels prior to sentencing. (Sentencing Hr'g Tr. 3:21-23.)

11. After considering the argument of counsel and letters from various family members, Judge Hudson sentenced Daniels to 135 months of imprisonment, the high end of the guidelines range. (Sentencing Hr'g Tr. 12:18-20.)

12. At the conclusion of the sentencing, the Court stated to Daniels:

> As part of your plea agreement, Mr. Daniels, you waived your right of appeal as to almost every sentencing issue, but if you feel I have done anything unlawful not covered by that wavier, you need to let Mr. Jackson know. If you wish to note an appeal that appeal must be noted within ten days. I strongly suggest that before you leave today you and Mr. Jackson discuss whether you wish to note an appeal to your sentence.

(Sentencing Hr'g Tr. 15:13-21.)

### C. Daniels's Account of His Post-Sentencing Communications with Jackson

13. At the evidentiary hearing, Daniels testified that immediately following his sentencing, while still in the courthouse, he had a brief conversation with Jackson in which Daniels indicated that he would like to appeal his sentence. (Evid. Hr'g Tr. 18:14-19:3.) Although Daniels knew he had waived his right to appeal his case, Daniels testified that Judge Hudson's instruction on the deadline for filing an appeal made him believe he could appeal his sentence. (Evid. Hr'g Tr. 24:17-25:21.) Daniels testified that immediately after sentencing he asked Jackson to appeal his sentence based on the fact that Judge Hudson did not rule on his objections to the PSR. (Evid. Hr'g Tr. 35:18-36:4.) According to Daniels, Jackson told him that he could not discuss an appeal at that time and suggested that Daniels contact him at another time. (Evid. Hr'g Tr. 19:3-6.)

14. Daniels further testified that within ten days of his sentencing hearing, he phoned his sister, Idina Daniels, from Northern Neck Regional Jail and requested that she arrange a three-way conference call with Jackson. (Evid. Hr'g Tr. 19:17-19, 20:1-3.) Once Ms. Daniels connected Jackson to the call, Daniels testified that he instructed Jackson to file an appeal of his case. (Evid. Hr'g Tr. 20:7-9.) Jackson, in response, told Daniels that an appeal was not in his best interest, that he would probably receive the same sentence, and that an appeal would cost $2,000. (Evid. Hr'g Tr. 20:9-15.) Jackson then abruptly changed and ended the conversation, but Daniels testified he never instructed Jackson not to file the appeal. (Evid. Hr'g Tr. 20:15-21:1.)

15. Daniels gave conflicting testimony about his expectation at the close of this conversation. Daniels first testified that, based on the conversation, he believed Jackson would file an appeal on his behalf. (Evid. Hr'g Tr. 21:2-5, 28:3:9.) However, Daniels later admitted

8

that at the close of the conversation he was confused and did not know whether or not Jackson would file an appeal as requested. (Evid. Hr'g Tr. 26:17-23, 28:10-14, 30:13-15, 31:15-21.) Despite any confusion as to whether Jackson would file an appeal and despite the fact that Daniels and his family knew how to contact Jackson, Daniels stated that he never contacted Jackson to ask him whether an appeal had been or would be filed. (Evid. Hr'g Tr. 26:9-16, 27:4-12, 31:22-32:2.) Further, Daniels did not pay Jackson $2,000 and did not inform Jackson whether he could afford the $2,000 fee. (Evid. Hr'g Tr. 22:6-10.)

16. On October 29, 2008, about three months after Daniels's sentencing, Daniels wrote to Jackson indicating his intention to pursue post-conviction relief and requesting a copy of his criminal file. (Evid. Hr'g Tr. 21:12-22; United States' Submission of Former Defense Counsel's Affidavit Ex. 1, at 5-6 ("Letter to Brent A. Jackson from Bailey Daniels, III (Oct. 29, 2008)").) In this letter, Daniels did not inquire about the status of any pending appeal and even indicated that he understood that Jackson's representation in his case had ended.

17. By responsive letter dated November 4, 2008, Jackson enclosed a copy of Daniels's file. (United States' Submission of Former Defense Counsel's Affidavit Ex. 1, at 2 ("Letter to Bailey Daniels, III from Brent A. Jackson (Nov. 4, 2008)").) Daniels testified that he first learned that Jackson had never filed an appeal once he received this response and a copy of his case file. (Evid. Hr'g Tr. 34:21-35:2.)

18. Daniels's sister, Idina Daniels, also testified as to the three-way phone conversation between her, Daniels, and Jackson that occurred shortly after Daniels's sentencing. (Evid. Hr'g Tr. 3:15-17, 4:15-7:14.) Ms. Daniels testified that a few days after Daniels's sentencing, Daniels called her and asked her to initiate a conference call with Jackson to discuss

his appeal. (Evid. Hr'g Tr. 4:19-25.) Ms. Daniels complied and arranged a three-way call between her, Daniels, and Jackson. (Evid. Hr'g Tr. 5:1-4.)

19. Although Ms. Daniels swore in her affidavit that she "was a witness to that conversation from beginning to end" (Pet'r's Resp. to Court Order Ex. 3, Idina Daniels Aff. ¶ 7), Ms. Daniels admitted at the evidentiary hearing that she had listened only to the beginning of this conversation because she placed the phone down after a while (Evid. Hr'g Tr. 5:5-7, 16:1-11).

20. Ms. Daniels testified that Daniels asked Jackson "about appealing his case" during this conversation and specifically told Jackson he wanted to appeal. (Evid. Hr'g Tr. 5:10-11, 16-22.) According to Ms. Daniels, Jackson discussed the merits of an appeal, a potential fee for any appeal, and reasons why Daniels should not file an appeal, ultimately advising Daniels against filing an appeal. (Evid. Hr'g Tr. 5:13-15, 11:17-23.) Ms. Daniels could not recall Daniels's response to this discussion about the appeal. (Evid. Hr'g Tr. 16:16-19.) Ms. Daniels did not know whether Daniels agreed to any fee to retain Jackson to appeal the case. (Evid. Hr'g Tr. 12:4-10.)

21. Although she knew Daniels had a limited time in which to note an appeal and she had Jackson's office and cell phone numbers, Ms. Daniels never contacted Jackson after this conversation to ensure an appeal had been filed or to discuss any pending appeal. (Evid. Hr'g Tr. 11:10-13, 13:5-16.) Ms. Daniels also testified that Daniels never asked her to contact Jackson about the purportedly requested appeal. (Evid. Hr'g Tr. 13:17-19.)

### D. Jackson's Account of His Post-Sentencing Communications with Daniels

22. In contrast, Jackson testified that immediately after Daniels's sentencing, Jackson instructed Daniels to give him a call so that they might discuss Daniels's appeal rights. (Evid.

10

Hr'g Tr. 42:17-18.) According to Jackson, Daniels called within twenty-four hours of sentencing through a third party. (Evid. Hr'g Tr. 42:18-24.) Although Jackson could not recall the identity of the third party, he testified that the third party did not participate in the conversation. (Evid. Hr'g Tr. 43:5-11.) Jackson stated it was not unusual for Daniels to call through a third party, such as his mother, girlfriend, or sister, but Jackson testified that all but Daniels's mother would usually put down the phone and not participate in the conversation. (Evid. Hr'g Tr. 42:20-43:1.)

23. Jackson testified that, during this phone call, he and Daniels discussed whether or not Daniels should appeal. (Evid. Hr'g Tr. 43:23-25.) Jackson advised Daniels of the ramifications of appealing, what issues might be appealed, and the likelihood of success given Daniels's guilty plea and appeal waiver. (Evid. Hr'g Tr. 44:1-5, 51:2-5.) Jackson also testified, based on his standard operating procedure, that he likely quoted Daniels a potential fee for any appeal, informed Daniels of the time limitation in which to note an appeal, and instructed him to contact him if he wished to appeal. (Evid. Hr'g Tr. 44:20-25, 46:5-16.)

24. Subsequent to this conversation, neither Daniels nor a family member contacted Jackson about filing an appeal, and Jackson did not file an appeal in the case. (Evid. Hr'g Tr. 46:12-16.) Jackson reviewed Daniels's case file prior to the evidentiary hearing, and nothing in the case file suggests that Daniels or a family member ever requested that Jackson file an appeal. (Evid. Hr'g Tr. 46:17-24.) Jackson testified that the next communication he received from Daniels was the October 29, 2008 letter in which Daniels requested a copy of his case file. (Evid. Hr'g Tr. 47:13-23; Letter to Brent A. Jackson from Bailey Daniels, III (Oct. 29, 2008).)

25. Jackson testified that Daniels never asked him to file an appeal and that if Daniels had asked him to note an appeal, he would have done so. (Evid. Hr'g Tr. 44:14-19, 45:6-7, 50:19-24.) Jackson also described his typical practice with regard to filing a notice of appeal and

11

stated that if he were unsure as to whether a client wanted to appeal a case, he would "err on the side of being embarrassed by appealing the matter." (Evid. Hr'g Tr. 64:21-22.)

### E. Jackson's Version of Events Is More Credible than Daniels's Version

26. Having considered the above and having weighed the credibility of the witnesses, the Court finds that Daniels never expressly requested that Jackson file an appeal of his case. The record before the Court conveys that Daniels never made arrangements to retain Jackson for an appeal and never inquired about the status of any requested appeal. Daniels's admission that he did not know whether Jackson would file an appeal or not cannot be reconciled with the fact that Daniels took no action to contact Jackson to ensure that an appeal had been or would be filed and did not seek to file an appeal on his own behalf. Instead, this admission suggests that Daniels never expressly requested that Jackson file an appeal. Similarly, Ms. Daniels's testimony that Daniels directed Jackson to file an appeal is undermined by the fact that, contrary to her sworn affidavit, she testified in court that she listened only to the beginning of the phone conversation and could not recall Daniels's response to Jackson's advice about whether to file an appeal. Ultimately, the Court credits Jackson's version of the substance of his conversations with Daniels over the Daniels version of the same events.

27. While Daniels never expressly requested an appeal, the Court finds that Daniels did inquire about the possibility of appealing. Testimony from both Daniels and Jackson reflects that Jackson consulted with Daniels about the possibility of appealing. Jackson discussed with Daniels the likelihood of success given Daniels's waiver in his plea agreement and the fee associated with filing an appeal. Jackson counseled Daniels that an appeal was not in his best interest, and Daniels agreed.

## IV. Analysis

### A. Standard of Review for a Claim of Ineffective Assistance of Counsel for Failure to File an Appeal

The standard set forth by the Supreme Court of the United States in *Strickland v. Washington* governs claims of ineffective assistance of counsel. 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that the Sixth Amendment guaranteed a criminal defendant's right to reasonably effective assistance of counsel. *Id.* at 687. To prove a constitutional claim for ineffective assistance of counsel, the petitioner must first show that his or her counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must demonstrate actual prejudice from the deficiency. *Id.* at 694.

In conjunction with *Strickland*, the decision of the Supreme Court in *Roe v. Flores-Ortega* governs ineffective assistance of counsel claims for failure to file a notice of appeal. *See* 528 U.S. 470 (2000). In *Flores-Ortega*, the Supreme Court held that:

> [C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.

*Id.* at 480. This determination must take into account "all the information counsel knew or should have known." *Id.*

If a consultation about appeal has occurred, counsel performs deficiently only by failing to follow the defendant's express instructions with respect to an appeal. *Id.* at 478. "[A] criminal defense attorney's failure to file a notice of appeal when requested by his client deprives the defendant of his Sixth Amendment right to the assistance of counsel, notwithstanding that the lost appeal may not have had a reasonable probability of success." *United States v. Peak*, 992

13

F.2d 39, 42 (4th Cir. 1993). Moreover, "an attorney is required to file a notice of appeal when unequivocally instructed to do so by his client, even if doing so would be contrary to the plea agreement [because the defendant has waived his right to appeal] and harmful to the client's interests." *United States v. Poindexter*, 492 F.3d 263, 273 (4th Cir. 2007).

If the attorney received no express instruction to file a notice of appeal, and no consultation has occurred, a court must determine "whether counsel's failure to consult with the defendant itself constitutes deficient performance." *Flores-Ortega*, 528 U.S. at 478. The prejudice prong of *Strickland* requires "that counsel's deficient performance must actually cause the forfeiture of the defendant's appeal. If the defendant cannot demonstrate that, but for counsel's deficient performance, he would have appealed, counsel's deficient performance has not deprived him of anything, and he is not entitled to relief." *Id.* at 484. "Thus, to prevail on an ineffective assistance claim for failing to note an appeal, a defendant need not 'demonstrate that his hypothetical appeal might have had merit,' but rather only that 'but for counsel's deficient conduct, he would have appealed.'" *Jiminez v. Vaughan*, No. 3:07cv639, 2008 WL 2329767, at *3 (E.D. Va. June 5, 2008) (*quoting Flores-Ortega*, 528 U.S. at 486).

B. <u>Daniels's Claim Fails</u>

1. <u>Daniels Did Not Timely Instruct Jackson to File an Appeal</u>

The record demonstrates that Daniels did not ask Jackson to file an appeal within the ten-day period following his sentencing. Daniels's and Ms. Daniels's testimony that he did ask Jackson to file an appeal lacks credibility. *See supra* Part III.E. Conversely, Jackson testified credibly that Daniels never asked him to file an appeal after he pled guilty, after he was sentenced, or in any conversation after sentencing.

14

Additionally, Daniels received information regarding the procedure for filing an appeal. The Court informed Daniels during the sentencing hearing that he had to file any notice of appeal within ten days. Nevertheless, Daniels failed to timely protest to the Court Jackson's alleged failure to file an appeal. Further, Daniels failed to take independent measures to file an appeal within ten days, despite the fact that he testified that he was confused and did not know whether Jackson would file an appeal after his supposed express request to do so.

Having weighed the credibility of the witnesses and having considered the evidence before the Court, the Court finds that Daniels did not instruct Jackson to file an appeal.

### 2. Jackson Properly Consulted with Daniels Regarding an Appeal

Absent an express instruction to file a notice of appeal, the Court must consider whether Jackson had a duty to consult with Daniels about an appeal. *Flores-Ortega*, 528 U.S. at 480. The Constitution requires counsel to consult with the defendant about an appeal only "when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* "Consult," as defined by the Supreme Court, means to advise "the defendant about the advantages and disadvantages of taking an appeal, and [make] a reasonable effort to discover the defendant's wishes." *Id.* at 478. Whether the defendant proceeded to trial or pled guilty becomes a highly relevant factor to this inquiry. *Id.* If the defendant pled guilty, the court should consider whether the defendant received the sentence bargained for in a plea agreement and whether the defendant waived some or all rights to appeal in the plea agreement. *Id.*

The Court finds that Jackson had a duty to consult with Daniels about an appeal because the record demonstrates that Daniels did inquire about the possibility of an appeal. However, the

15

Court finds that Jackson fulfilled his duty to consult by discussing the advantages and disadvantages of filing an appeal. Specifically, testimony from both Jackson and Daniels reflects that Jackson instructed Daniels about the costs of pursuing an appeal and the unlikelihood of success given his guilty plea and waiver of most of his appellate rights. Daniels already had received one benefit from his plea: the fact that the sentencing enhancement doubling his mandatory minimum sentence to 20 years had not been filed. Jackson concluded that an appeal would not be in Daniels's best interests, and the record reflects that, after engaging in this consultation, Daniels agreed with Jackson's assessment. Nothing before this Court suggests otherwise.

## V. Conclusion

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS Daniels's remaining claim and DENY the § 2255 Petition.

Daniels is ADVISED that he may file specific written objections to the Report and Recommendation within fourteen (14) days of the date of entry hereof. Each objection should be labeled with the corresponding heading from the Report and Recommendation, should be numbered, and should identify with specificity the legal or factual deficiencies of the Magistrate Judge's findings. Failure to file specific objections in a timely manner to the Report and Recommendation may result in the entry of an Order dismissing the Petition. *See* Fed. R. Civ. P. 72(b). It may also preclude further review or appeal from such judgment. *See Wright v. Collins*, 766 F.2d 841, 845 (4th Cir. 1985) (noting the general rule that "a party who fails to object to a magistrate's report is barred from appealing the judgment of a district court adopting the magistrate's findings").

Let the Clerk send a copy of the Report and Recommendation to all counsel of record and to the Honorable Henry E. Hudson.

And it is so ORDERED.

/s/ M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: May 27, 2011